# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  '23 MJ3391 MSB
Black iPhone )
FPF: 2023250100056801-010 )
)
)

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841, 846 | Distribution and Conspiracy To Distribute Controlled Substances |
| 21 USC Sec. 952, 960, 963 | Importation and Conspiracy to Import Controlled Substances |

The application is based on these facts:

See Attached Affidavit of HSI Special Agent Jacob Schneeberger, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jacob Schneeberger*
Applicant's signature

Jacob Schneeberger, HSI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___ *(specify reliable electronic means)*.

Date: September 29, 2023

Judge's signature

City and state:  San Diego, California      Honorable Michael S. Berg, United States Magistrate Judge
Printed name and title

**Attachment A-1**

**Item to be Searched**

The item to be searched is described as follows:

Black iPhone, FPF: 2023250100056801-010 ("**Target Device 1**")

A photo of **Target Device 1** is shown below.



**Target Device 1** is currently in the custody of Homeland Security Investigations at 880 Front Street, Suite 3200, San Diego, CA 92101.

# Attachment B

## Items to be Seized

Authorization to search the **Target Devices** described in Attachments A-1 through A-4 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Devices** for evidence described below. The seizure and search of the **Target Devices** shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, beginning **July 1, 2023, up to and including September 14, 2023**:

a. tending to indicate efforts to deliver controlled substances from Mexico to the United States, or to sell or distribute controlled substances in the United States;

b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to deliver controlled substances from Mexico to the United States to traffic, sell or distribute controlled substances in the United States or to conduct money laundering activity;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to deliver controlled substance from Mexico to the United States or to traffic, sell or distribute controlled substances in the United States;

d. tending to identify travel to or presence at locations involved in efforts to deliver controlled substance from Mexico to the United States, or to traffic, sell or distribute controlled substances in the United States;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963 (the Target Offenses).

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Jacob Schneeberger, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for warrants to search the following electronic devices:

- Black iPhone, FPF: 2023250100056801-010 ("**Target Device 1**");
- Black Samsung cellular phone, FPF: 2023250100056801-009 ("**Target Device 2**");
- Black Samsung cellular phone, FPF: 2023250100056802-002 ("**Target Device 3**"); and
- Black Motorola cellular phone, FPF: 2023250100056802-003 ("**Target Device 4**")

(collectively, the "**Target Devices**"), as further described in Attachments A-1, A-2, A-3, and A-4 and to seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 841(a)(1), 846 (possession with intent to distribute controlled substances and conspiracy to distribute controlled substance), and 952, 960, and 963 (importation of and conspiracy to import controlled substances) (collectively, the "Target Offenses"), as further described in Attachment B. The requested warrant relates to an investigation of David MADRIGAL ("MADRIGAL") and Domingo OWEN ("OWEN") for violations of the Target Offenses. The **Target Devices** are currently in the custody of Homeland Security Investigations at 880 Front Street, Suite 3200, San Diego, CA 92101.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining search warrants for the **Target Devices**, it does not contain all of the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## EXPERIENCE AND TRAINING

3. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a Special Agent ("SA") with ICE, Homeland Security Investigations ("HSI") since July 2016. I am assigned to a Financial Investigations group in San Diego, California, that focuses on money laundering and bulk cash smuggling of illicit proceeds on the Southwest Border. Before working for HSI, I was a Border Patrol Agent in San Diego for 13 years. I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offenses and work closely with other agencies, including the Drug Enforcement Administration, Federal Bureau of Investigation, and multiple state and local agencies.

4. As a federal law enforcement officer for over 20 years, I have received formal training, as well as extensive on-the-job training, relative to the investigation of narcotics distribution, trafficking, and importation. I have investigated illegal activity such as controlled substances, money laundering, bulk cash smuggling, and other crimes that have resulted in arrests, indictments, and convictions. While participating in these and other criminal investigations, I have executed search warrants on, residences, vehicles, electronic devices, and storage facilities. As a result, I have become familiar with methods and techniques used by narcotics traffickers to import narcotics into the U.S. and distribute those narcotics within the U.S. and the methods and techniques used by money launderers and narcotics traffickers to derive, launder, and conceal illicit proceeds, and to use these proceeds to promote and facilitate unlawful activity. I have also participated in undercover operations which involved the transportation, and distribution of narcotics and other illicit items.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the

controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry and then to further distribute the narcotics within the United States, including in the San Diego, California area. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States, and traffickers within the United States frequently communicate with each other regarding importation and distribution of narcotics. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States and further distribution thereof.

6. Based on my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods utilized in narcotics trafficking operations and some of the unique trafficking patterns employed by narcotics organizations. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones. Through these investigations, my training and experience, and my conversations with other law

enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am also familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law enforcement including but not limited to the use of cellular telephone technology, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including their methods of distribution, storage, and transportation of narcotics, their methods of collecting proceeds of narcotics trafficking, and their methods of laundering money to conceal the nature of the proceeds. Based on my training and experience, I know that drug trafficking at the retail level is largely a cash business. I know that drug traffickers often generate large amounts of unexplained wealth, and through financial transaction, attempt to conceal, disguise or legitimize unlawful proceeds, through domestic and international banks and their attendant services, and otherwise legitimate businesses which generate large quantities of currency. In addition, drug traffickers often use drug proceeds to purchase additional narcotics to perpetuate and promote the ongoing conspiracy. I know that drug traffickers often use cellphones to communicate with co-conspirators in furtherance of their money laundering activities. During the course of my employment, I have also become familiar with the ordinary meaning of controlled substance slang and jargon, and with the methods of packaging, consuming and transferring of controlled substances. I am also familiar with the manners and techniques of traffickers in methamphetamine, cocaine, heroin, marijuana, and fentanyl as practiced locally, including the importation from Mexico.

7. Based on my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular devices (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat

logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular device. Specifically, searches of cellular devices of individuals involved in the importation of narcotics may yield evidence:

    a.    tending to indicate efforts to deliver controlled substances from Mexico to the United States, or to sell or distribute controlled substances in the United States;

    b.    tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to deliver controlled substances from Mexico to the United States to traffic, sell or distribute controlled substances in the United States or to conduct money laundering activity;

    c.    tending to identify co-conspirators, criminal associates, or others involved in efforts to deliver controlled substance from Mexico to the United States or to traffic, sell or distribute controlled substances in the United States;

    d.    tending to identify travel to or presence at locations involved in efforts to deliver controlled substance from Mexico to the United States, or to traffic, sell or distribute controlled substances in the United States;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## **FACTS SUPPORTING PROBABLE CAUSE**

7.    On September 14, 2023, Special Agents of Homeland Security Investigations were conducting surveillance on a gold Jeep Cherokee bearing California license plates (hereinafter "the Jeep") in San Diego, California, based on location data obtained through a tracking warrant authorized by a California Superior Court Judge. The warrant was obtained following an earlier inspection of the Jeep at a port of entry, when a trained canine alerted to a non-factory compartment within the vehicle.

8. Earlier in the year, on March 23, 2023, Customs and Border Protection Officers at the San Ysidro Port of Entry discovered an after-market compartment in the Jeep. The compartment was discovered after a trained canine at the port of entry alerted to the rear cargo area of the Jeep, and upon inspection, officers discovered a non-factory, lead-lined compartment in that area of the vehicle. An officer covertly placed a tracking device on the Jeep and, on March 24, 2023, applied for and obtained a tracking warrant authorized by a California Superior Court Judge. Investigators did not receive tracking data from the device until after the warrant was obtained. After that, although the Jeep had made several crossings into the United States during March 2023, the Jeep crossed back into Mexico and did not cross back into the United States until July 4, 2023. At that time, the vehicle had a new and different California license plate, registered owner, and driver. However, the Jeep stopped crossing the border into San Diego (it had previously been making regular cross-border trips).

9. During a July 28, 2023 border crossing by the vehicle at the Otay Mesa Port of Entry, a trained canine alerted to the rear cargo area of the Jeep, and upon inspection, officers discovered the non-factory compartment in that area of the vehicle. Officers found and removed the prior tracking device and covertly installed a new device. The same day, investigators applied for and obtained a tracking warrant for the Jeep authorized by a California Superior Court Judge. Investigators did not receive tracking data from the device until after that warrant was obtained. Another Superior Court Judge authorized the continued use of a tracking device on the Jeep through a warrant issued on September 6, 2023.

10. Based on my training and experience, I am aware that non-factory compartments in vehicles are commonly used to smuggle narcotics and proceeds of illegal activities between Mexico and the United States and within the United States. Based on my training and experience, and the facts set forth above—including the canine alerts to the Jeep's rear cargo area—I believe that the Jeep had been used and was being used for importing and distributing narcotics since at least early July 2023.

11. On September 14, 2023, Special Agents of Homeland Security Investigations were conducting surveillance on the Jeep in San Diego, California, based on location data obtained through the tracking warrant described above. At approximately 7:00 a.m. on September 14, the Jeep entered a private parking lot in the Barrio Logan area of San Diego. Agents observed a male individual, later identified as OWEN, and two unidentified male individuals, place black bags into the Jeep. OWEN then departed the area in a black Chevrolet Camaro bearing California license plates (hereinafter "the Camaro").

12. The Jeep then departed the parking lot and proceeded northbound on Interstate 15. Agents later located the Jeep parked next to an apartment complex in the Mira Mesa area of San Diego. At approximately 8:50 a.m. the same day, agents observed the Camaro parked on the street in the vicinity of the same apartment complex, directly in front of the Jeep. Agents observed an unknown male, later identified as MADRIGAL, approach the Jeep while rolling a gray trashcan. MADRIGAL removed approximately three black trash bags from the Jeep and placed them in the trashcan. OWEN was observed standing on the sidewalk near MADRIGAL while the bags were placed in the trashcan. MADRIGAL then walked out of view towards the apartment complex, rolling the trashcan which contained the black bags. OWEN entered the Camaro and exited the area.

13. Approximately 10 minutes later, based on what agents knew about the Jeep and its compartment and their observations on September 14, agents believed they had observed a transaction relating to drug trafficking and approached MADRIGAL in a common area of the apartment complex. Agents identified themselves as law enforcement officers and attempted to conduct a consensual encounter. MADRIGAL attempted to flee on foot. Agents pursued MADRIGAL, on foot, and detained him after a brief struggle.

14. At approximately 9:25 a.m. on September 14, agents searched MADRIGAL's person and found **Target Device 1** in his front pants pocket, along with a set of keys. They also located **Target Device 2** on the ground, where agents had observed it fall out of MADRIGAL's pants pocket during the struggle to detain him.

15. Agents became aware of two maintenance closets located in a common parking area of the apartment complex. A witness near the scene informed agents of the closets and that MADRIGAL was often in that area, as he was a janitor who worked at the apartment complex. MADRIGAL had keys to these closets on his person, as agents found upon detaining him as noted above. Agents obtained consent from apartment management to search these closets and used MADRIGAL's keys to do so. In one closet, agents found the rolling trashcan. Inside of the trashcan were black trash bags, which contained several plastic-wrapped bundles of suspected narcotics. The trash bags appeared to be the same bags (and were the same size and color) as the trash bags agents saw MADRIGAL remove from the Jeep and place in the trashcan, as described above. Also, the trashcan appeared to be the same trashcan MADRIGAL placed bags into from the Jeep. In another area of the same closet, agents located a kilogram-sized brick inside of a UPS box. In the other closet, agents found a scale with white powdery residue and a plastic bin with loose white powder at the bottom of the bin. In total, agents seized one brick of cocaine, a bag of cocaine powder, one brick of fentanyl powder, one bundle of fentanyl pills, and nine bundles of methamphetamine, all of which were found in the maintenance closet as described above. Presumptive tests were conducted on the suspected narcotics. The substances field-tested positive for the properties of cocaine, methamphetamine, fentanyl, totaling approximately 1.76 kilograms of cocaine, 20.34 kilograms of methamphetamine, 1.06 kilograms of fentanyl powder, and 1.26 kilograms of fentanyl pills.

16. MADRIGAL was placed under arrest at approximately 11:05 a.m. He was advised of and waived his *Miranda* rights. In summary, after waiving his rights, MADRIGAL told agents that he had had special trash that he brought to a Tesla, to be brought away, because this special trash could not be disposed at the apartment complex. (Agents had not observed any Tesla at or around the apartment complex on September 14.) MADRIGAL also denied knowing about any drugs or drug trafficking.

17. Shortly thereafter, agents encountered OWEN sitting inside of the Camaro, which was directly outside of the same apartment complex, on the street. OWEN was

arrested by agents at approximately 12:30 p.m.. A search of his person yielded **Target Device 3** in his sweatpants front pocket. OWEN consented to a search of his vehicle, and agents discovered **Target Device 4** in the center console area. OWEN acknowledged to agents that both **Target Device 3** and **Target Device 4** belonged to him.

18. OWEN initially provided agents with consent to search both devices. Agents conducted a cursory manual search. Then, during a post-*Miranda* interview, OWEN stated he knew the trash bags contained narcotics and he verified their contents by counting the bundles inside of the bags. OWEN stated he felt a brick inside of the trash bags and knew what a brick (of narcotics) felt like because he previously sold narcotics. OWEN also stated he knew MADRIGAL and they worked together "cleaning." During his interview with agents, OWEN also revoked his prior consent to search **Target Devices 3** and **4**. I am not relying on any information obtained during agents' manual, consent search of these devices in this affidavit and in this request for warrants to search these cellphones.

19. All **Target Devices** were seized from MADRIGAL and OWEN by HSI agents.

20. MADRIGAL and OWEN were charged with violations of Title 21, United States Code, Sections 841(a)(1) and 846, conspiracy to distribute controlled substances.

21. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe MADRIGAL and OWEN were using the **Target Devices** to communicate with each other and others to further the importation of illicit narcotics into the United States, along with the transportation and sales of illicit narcotics within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a

defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as the MADRIGAL and OWEN, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. In addition, based on my training and experience, I believe that individuals in possession of drugs and quantities such as MADRIGAL and OWEN were here are often involved in the trafficking activity for weeks, months, or longer and have a certain level of trust within an organization. For that additional reason, I believe that MADRIGAL and OWEN were involved in smuggling narcotics for weeks, months, or longer before their arrests on September 14, 2023. Accordingly, I request permission to search the **Target Devices** for data **beginning on July 1, 2023, up to and including September 14, 2023**.

## METHODOLOGY

22.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all

of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the Target Device and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

## **PRIOR ATTEMPTS TO OBTAIN EVIDENCE**

25. Except as noted in this affidavit, investigators have not attempted to obtain the evidence sought here by other means. As noted above, I am not relying on any information from OWEN's initial consent to search his phones in this affidavit and application for the requested search warrants.

## **CONCLUSION**

26. Based upon my experience and training, consultation with other law enforcement officers experienced in drug investigations, and all the facts and opinions set forth in this affidavit, I believe that probable cause exists to conclude that the **Target Devices**, as further described in Attachments A-1 through A-4, incorporated herein, were utilized to facilitate violations of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963. Furthermore, I believe there is probable cause to conclude that the **Target Devices** contain stored data that constitutes evidence, fruits, and instrumentalities of such violations, and I respectfully request warrants be issued authorizing a search for

and seizure of that data, as further described in Attachment B, incorporated herein. For the reasons provided, I seek authority to search the **Target Devices** from June 14, 2023, through September 14, 2023.

    I swear the foregoing is true and correct to the best of my knowledge, information, and belief.

*Jacob Schneeberger*
Special Agent Jacob Schneeberger
Homeland Security Investigations

    Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 5.1 this 29th day of September 2023.

_____
Honorable Michael S. Berg
United States Magistrate Judge